**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**NORFOLK DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 2:13cr40 |
| | ) | |
| IOANNIS PROKAKIS, | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

GOVERNMENT'S POSITION WITH RESPECT TO
SENTENCING FACTORS IN THE PRESENCE REPORT

COMES NOW the United States of America, by undersigned counsel, and in accordance with Section 6A1.2 of the Sentencing Guidelines and Policy Statements and this Court's policy regarding guidelines sentencing, the United States hereby represents that it has reviewed the presentence report (PSR) prepared by the United States Probation Officer.

I.    **The United States Objects to the PSR**

Subornation of Perjury.    The United States acknowledges that the defendant has received an enhancement under Section 3C1.1 for obstructing the Coast Guard's investigation, but believes that this enhancement is also appropriate because Prokakis, through the introduction of the testimony of Oleksiy Alekseyeyv, suborned perjury as contemplated by Application Note 4(B).    Alekseyeyv falsely testified that the bypass pipes were not onboard the M/V Thetis while he was working onboard.    Alekseyeyv's testimony was contradicted by the testimony of the engineering crewmembers and the photograph of the bypass pipes installed on M/V Thetis during the time Alekseyeyv was working on the ship.    Because Prokakis procured this testimony and was aware that it would be false prior to introducing it, he should be assessed an

1

enhancement under this section.    Subornation of perjury consists of three elements: the suborner (1) "should have known or believed or have had good reason to believe that the testimony given would be false; (2) should have known or believed that the witness would testify willfully and corruptly, and with knowledge of the falsity; and (3) should have knowingly and willfully induced or procured the witness to give such false testimony."    *U.S. v. Ethridge*, 519 Fed.Appx 828, 830 (4th Cir. 2013) (citing *Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959).    To procure the deposition testimony of Alekseyeyv, defendant filed with this Court a motion to compel the deposition and provided a summary of expected testimony which included statements that the magic pipes were not on the vessel and that they were never used.    ECF Doc 43-4 at 3. Defendant knew that what Alekseyeyv would testify to would be false. Not only did the defendant know that Alekseyeyv would testify falsely, he actively campaigned to acquire his testimony by asking the Court to order that his deposition be taken overseas and on the eve of trial.    After knowingly and intentionally procuring Alekseyeyv's false deposition testimony, defendant introduced that deposition into evidence.

<u>Threat to Cause Physical Injury</u>.    The United States also objects to Paragraph 40 because it fails to include the 8 level enhancement pursuant to Section 2J1.2(b)(1)(B) for threatening to cause physical injury to a person during the course of the obstructive conduct. According to the third engineer, defendant Prokakis threatened to kill him on two separate occasions after the third engineer delivered the sounding log to the Coast Guard.    In opposition to this enhancement, the defendant argues that his threat to the third engineer was not serious and he did not actually commit violence against the third engineer.    The defendant reads additional requirements into the guideline section for application of this sentencing enhancement.    Nowhere in the plain language of the enhancement is there a requirement that either the threat of violence be

2

"serious" or that a defendant follow through on his threat.  *See United States v. Bakhtiari*, 714 F.3d 1057, 1061 (8th Cir. 2013) ("To the extent Bakhtiari argues these actions were not 'serious' enough to merit the enhancement, we observe [2J1.2(b)(1)(B)] does not impose an additional 'seriousness' requirement beyond the fact of a violent threat.") (citing *United States v. Plumley*, 207 F.3d 1086, 1090 (8th Cir. 2000).   Therefore, the government respectfully requests that an 8 level enhancement be applied pursuant to Section 2J1.2(b)(1)(B).

<u>Probative Record</u>.   The United States respectfully requests that a 2 level enhancement be applied pursuant to Section 2J1.2(b)(3)(B) because the Oil Record Book is both an essential and a particularly probative record.   Specifically, it is the only record on the vessel that documents the vessel's compliance with MARPOL Annex I in regards to management of machinery space oily waste.   Additionally, three years worth of the Oil Record Book is mandated by MARPOL, APPS, and 33 CFR 151 to be maintained on the vessel and readily available for inspection.   In *U.S. v. Sanford*, 1:11-cr-00352 (D.D.C. Jan. 11, 2013), the district court was confronted by a similar situation.   In that case, the court found that the Oil Record Book did meet the requirements to be classified as a "probative record" for the purposes of Section 2J1.2(b)(3)(B).   The court stated, "the maintenance and false entries in the Oil Record Book … is the key document for enforcement under MARPOL.   And, therefore, this clearly qualifies as an especially probative record or document that was – in which false entries were made."   ECF Doc 124-1 at 20-21.

As such, defendant Prokakis should be assessed a two level enhancement pursuant to Section 2J1.2(b)(3)(B).   The government submits that the total offense level for defendant Prokakis should be 33 and the resulting properly calculated guideline range should be 135-168 months.

## II.    Evidence

The United States intends to introduce into evidence an affidavit from Coast Guard Captain David S. Fish appended hereto as Exhibit A, an excerpt from *United States v. Oria*, 08-CR-1027 (D. Mass. May 6, 2009), appended hereto as Exhibit B, and a report from the Organization for Economic Co-operation and Development entitled, "Cost Savings From Non-Compliance with International Environmental Regulations in the Maritime Sector," appended hereto as Exhibit C.

## III.    Defendant's Objection to Being in the Conspiracy

The defendant objects to the factual assertions that he was a part of the conspiracy that started in October 2011.   Defendant contends that he did not get onboard the vessel until April 2012, and therefore was not a part of the conspiracy that started in October 2011.   The United States contends that even though defendant did not arrive on the vessel until April 2012, he joined into the existing conspiracy that began in October 2011.

## IV.    Defendant's Objections Related to the Discharge of Sludge

The defendant asserts that it was conclusively shown at trial that sludge was never discharged from the vessel while the defendant was onboard.   However, there was testimony during trial from Mr. Fernando (cadet) and Mr. Tan (oiler) that defendant ordered the installation and use of the sludge magic pipe on one occasion during April 2012.   They also testified that after 2/E Boumpoutelos arrived onboard in May 2012, that he repaired the vessel's incinerator and the sludge magic pipe was no longer used.

## V.    Defendant's Objection to Enhancement for Role in the Offense

Defendant objects to the 4 level increase of the offense level pursuant to Section 3B1.1(b) because he was convicted only of record keeping offenses and that he was the only person to make entries in the Oil Record Book related to use of the Oil Water Separator.

Defendant was not simply convicted of "record keeping" offenses.   He was convicted of eleven felony counts including conspiracy, falsification of records, concealment of a tangible object in a federal investigation and obstruction of justice for ordering subordinate crewmembers to lie to the Coast Guard.   Defendant was convicted of Count 1 which charged him with conspiring to violate the Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a) to knowingly fail to maintain an Oil Record Book; to violate 18 U.S.C. § 1519 for falsifying the Oil Record Book with the intent to obstruct a federal investigation; and to violate 18 U.S.C. § 1519 by concealing a tangible object (magic pipes) with the intent to obstruct a federal investigation.   In order to effectuate the conspiracy, defendant ordered junior engineering crew to install, use, and hide the magic pipe and instructed his subordinates to lie to the Coast Guard.   Defendant failed to make any entries in the Oil Record Book notating the use of the magic pipe despite the fact that he routinely signed the Oil Record Book.   There is no dispute that there were five junior engineering crewmembers that were involved in the conduct that defendant ordered, therefore the sentencing enhancement of 4 levels is appropriate pursuant to Section 3B1.1(b).   Defendant cites to *U.S. v. Sanford*, 1:11-cr-00352 (D.D.C. Jan. 11, 2013) for the proposition that the court should refuse to apply a supervisory enhancement for a recordkeeping violation where only one individual was responsible for entries in the Oil Record Book.   This case is distinguishable from *Sanford* because the defendant in *Sanford* was not convicted of conspiracy, obstruction of justice for the concealment of tangible objects, or of obstruction of justice for ordering subordinates to

5

lie to the Coast Guard. The defendant in *Sanford* was only convicted of Oil Record Book violations. In this case, defendant was convicted of a much broader and more serious course of criminal conduct.

## VI.    Defendant's Objection to Grouping

Defendant objects to Counts 1, 2, 3 and 4 being grouped separately from Counts 1, 5, 6, 7, 8, 9 and 10 because all the counts involve the same conduct or harm. Pursuant to Section 3D1.2 counts should be grouped when they involve the same victim and the same act or transaction. Application Note 2 defines a "victim" to not only include a person who is harmed, but also the "societal interest" that is harmed. In this case, there are two distinct societal interests that are harmed: (1) the preservation of the marine environment, and (2) the integrity of the Coast Guard's Port State Control program. Counts 1, 2, 3 and 4 all relate to the failure to accurately maintain an Oil Record Book pursuant to the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1908(a). APPS is the United States' domestic implementation of the MARPOL treaty. MARPOL recognized the deliberate release of oil from ships constitutes a serious source of pollution and seeks the "complete" elimination of intentional pollution of the sea. MARPOL Protocol, 1340 U.N.T.S. 61. MARPOL mandates that Parties to MARPOL "undertake to give effect to the provisions of [MARPOL] in order to prevent the pollution of the marine environment…" Furthermore, Parties to MARPOL are to establish penalties for the violation of MARPOL that are "adequate in severity to discourage violations of [MARPOL] and shall be equally severe irrespective of where the violations occur." *Id*. at Article 4. Just as in 33 C.F.R. §151.25, MARPOL requires that vessel's maintain an Oil Record Book wherein the entries are signed by the persons or persons in charge of the operation, *Id*. at Regulation 17. One manner in which the United States enforces its obligations under MARPOL is to make it a felony to

knowingly fail to maintain an accurate Oil Record Book. There are often occasions, just as in this case, where the engineers choose to dump oily waste beyond the jurisdiction of the United States. Therefore in order to discourage violations of MARPOL, the United States enforces the recordkeeping requirements of MARPOL and proscribes that a knowing violations is a class D felony. 33 U.S.C. § 1908(a). The preservation of the marine environment is the first "societal interest" that is relevant for counts 1, 2, 3, and 4.

The second "societal interest" is the preservation of the integrity of the Coast Guard's Port State Control program as reflected in counts 1, 5, 6, 7, 8, 9 and 10. The Coast Guard routinely inspects ships for compliance with MARPOL and numerous other international treaties that government the safe operation of ships. Coast Guard inspectors routinely rely on the veracity of the ship's documents and the truthfulness of the ships' crew to determine if the vessel is being operated safely and complies with international and domestic laws restricting the pollution of the sea. Defendant knew that the M/V Thetis was not being operated properly because he had routinely ordered that the magic pipes be installed to discharge oily waste into the sea without using the Oil Water Separator. In fact the testimony at trial was that the sludge magic pipe was used once and the bilge tank magic pipe was used on every single voyage the vessel undertook. Defendant never recorded the use of the magic pipes in the Oil Record Book. In addition, he ordered that the magic pipes be hidden on top of the Engine Control Room knowing that the Coast Guard was very unlikely to ever inspect that area during a Port State Control inspection. Defendant sought to intentionally deceive the Coast Guard about the true nature in which the M/V Thetis was operated. Therefore, the counts are properly split into two groups that each have a different "victim" or "societal interest."

## VII.   **Defendant's Objection to Enhancement for Discharge**

Defendant objects to the 6 level enhancement pursuant to Section 2Q1.3(b)(1)(A) for a

repetitive discharge or emission of a pollutant into the environment.   Defendants' first basis of

objection is that it is inappropriate to consider discharges outside of United States' waters under

Section 2Q1.3(b)(1)(A).   In support of this position, defendant cites to the Third Circuit case of

*U.S. v. Abrogar*, 459 F.3d 430 (3rd. Cir. 2006).   *Abrogar* held that improper discharges of oily

bilge waters and oily sludges from a foreign vessel that occurred outside U.S. waters were not

"relevant conduct" for offense of conviction of failure to maintain an accurate oil record book

inside U.S. waters.   *Abrogar*, 459 F.3d. at 473.   This case is not binding on this Court and the

government continues to respectfully disagree with this decision.   In *United States v. Oria*,

08-CR-1027 (May 6, 2009), the court concluded that:

> "to talk about a reporting offense involving an actual discharge and,
> then, treating the actual discharge as if it were not involved is the
> equivalent of the old Zen Cohen(sic) of appreciating the sound of
> one hand clapping.   They are inextricably intertwined.   The
> discharge is directly involved.   There is no other way of looking at
> it, and, to the degree that an argument is made that this would be
> replicative because Section Five [2Q1.3(b)(5)] would lead to the
> same result, the concealment of a substantive environmental
> offense, I reject it."

*See* Exhibit B.   Courts are permitted to consider all relevant conduct, regardless whether it

occurred in the United States or not.   *See United States v. Wilkinson*, 169 F.3d 1236, 1238-1239

(10th Cir. 1999) (stating "It would be absurd to suggest that there is a long-standing principle that

judges cannot consider in calculating a sentence relevant conduct committed outside of the United

States.   In fact, 18 U.S.C. § 3661 clearly states otherwise, requiring that, "No limitation shall be

placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for the

purpose of imposing an appropriate sentence.")   Therefore, it is entirely appropriate for the Court to consider that defendant repetitively ordered the discharge of untreated machinery space bilge water directly into the sea and therefore the six level enhancement pursuant to Section 2Q1.3(b)(1)(A) is appropriate.

Defendant next contends that there was no evidence that there was any evidence of actual environmental contamination from the discharges.   In *U.S. v. Strandquist*, 993 F.2d 395, 400 (4th Cir. 1993) the court noted that under Section 2Q1.3(b)(1)(A) the "matter of proof of contamination has not yet been decided by the Fourth Circuit and need not be decided here….the district court's finding of contamination is not clearly erroneous." *Id*.   The court further stated "Though the evidence at trial did not reveal vast or permanent contamination, sufficient circumstantial evidence was produced for the court to infer environmental contamination from the discharges." *Id*.   The requirement found in MARPOL, APPS and the Coast Guard regulations which require that machinery space bilge water be processed through the Oil Water Separator is premised on the fact that machinery space bilges on large commercial vessels are in fact contaminated with oil. Government Exhibit 34P, the sample from the Bilge Water Tank was tested positive for oil. Government Exhibit 34C, the bypass pipe used to circumvent the Oil Water Separator, also tested positive for oil.   Defendant contends that there was no evidence that any oily water with a concentration of greater than 15ppm was discharged.   To the contrary, the government's evidence established that the bilge holding tank was routinely discharged by means of the "magic pipe." Furthermore, a comparison of Government Exhibits 44A and 34P demonstrates that the content of the bilge holding tank of the M/V Thetis, and thus the content of these illegal discharges, was an oily water mixture greater than 15 ppm.   Government Exhibit 44A is a sample containing 15 ppm of oil to water, and the oil is invisible to the naked eye, while Government Exhibit 34P, a sample

9

from the bilge holding tank, contains visible oil.   Not only does MARPOL presume that machinery space bilge water is contaminated, the government's proof at trial demonstrated that it was.

**VIII.   Defendant's Objection to "Guideline Inflation"**

Defendant objects to using the base offense level of 14 pursuant to Section 2J1.2 for his offenses of conviction for Counts 5, 6, 7, 8, 9 and 10 because to do so would be improper "guideline inflation."   Defendant does not cite to any authority in support of this proposition. Defendant was convicted of eight counts of violating 18 U.S.C. § 1519 for the intentional falsification of the Oil Record Book in anticipation of a Coast Guard Port State Control inspection and for ordering the magic pipe to be hidden on top of the Engine Control Room knowing the Coast Guard inspectors would not normally inspect that area.   Appendix A of the Guidelines refers to Section 2J1.2 as the appropriate base Guidelines.   Defendant maintains that his offenses of conviction are not with the scope of the Background commentary of Section 2J1.2.   However, Defendant's offenses, as described *supra*, fit squarely within the commentary as his actions sought to obstruct an administrative proceeding, namely, a Port State Control inspection.   Defendant cannot cite to any authority that supports his contention that using Guideline Section 2J1.2 is improper "guideline inflation" for a conviction of 18 U.S.C. § 1519.

This type of criminal conduct - altering documents to obstruct any government function - is the very type of conduct that 18 U.S.C. § 1519 is designed to prevent and punish, and why USSG Section 2J1.2 is the appropriate sentencing guideline.   Congress developed section 1519 as a part of the Sarbanes-Oxley Act to remedy the "loopholes" created by the "patchwork" of the other obstruction of justice statutes contained in Title 18 and stated that it is to be used broadly in application:

"Section 1519 is meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation of proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation. This statute is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter. It is also sufficient that the act is done 'in contemplation' of or in relation to a matter or regulation. It is also meant to do away with the distinctions, which some courts have read into obstruction statutes, between court proceedings, investigations, regulatory or administrative proceedings (whether formal or not), and less formal government inquiries, regardless of their title. Destroying or falsifying documents to obstruct any of these types of matters or investigations, which in fact are proved to be within the jurisdiction of any federal agency are covered by this statute ... The intent of the provision is simple; people should not be destroying, altering, or falsifying documents to obstruct *any* government function."

S. REP. NO. 107-146, pp. 14-15 (2002)(emphasis added).

Defendant next contends that the proper Guideline to use in this matter is Section 2E5.3 which is titled "False Statements and Concealment of Facts in Relation to Documents Required by the Employee Retirement Income Security Act; Failure to Maintain and Falsification of Records Required by the Labor Management Reporting and Disclosure Act; Destruction and Failure to Maintain Corporate Audit Records."   Clearly defendant was not charged with any of these described crimes.   Defendant contends that his conduct was less severe than that contemplated in Section 2J1.2 and thus using the base offense level of 6 under Section 2E5.3 is more appropriate.   Defendant has utterly failed to appreciate the severity of the actions he knowingly and intentionally undertook.   He was engaged in a concerted effort to prevent the Coast Guard from ascertaining that the M/V Thetis was not operated properly and that he was ordering the crew to illegally dump oily waste.   The consequences of getting caught were

11

severe.  If the Coast Guard Captain of the Port was aware that the vessel was illegally dumping, he could prevent the vessel from entering port and engaging in commerce – costing the owner and operator potentially millions of dollars.  The Captain of the Port could also detain the vessel which would again cost the owner and operator.  The most significant factor is that defendant was trying to dupe the Coast Guard into believing everything was operating on the ship properly. This worked fine until a junior crewmember blew the whistle.  Defendant never took any steps to stop the illegal discharges or report them to the Coast Guard or anyone else.  Falsifying a corporate audit report is not remotely comparable to the severity and significance of the criminal conduct that defendant engaged in here.  Moreover, pursuant to Section 2E5.3(a)(2)(C), if the offense (which is not applicable here) involved obstruction of justice, then apply Section 2J1.2 which was appropriately done in this case.

## IX.  A Sentence of 135-168 Months of Incarceration Complies with the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a) and (b).

In *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court made clear that sentencing courts should "consult [the Sentencing] Guidelines and take them into account when sentencing." *See also United States v. Biheiri*, 356 F.Supp.2d 589, 593 (2005) ("Justice Breyer's majority opinion in [*Booker*] sensibly teaches that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence."). The Supreme Court provided this direction to promote the sentencing goals of Congress, namely to "'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities[.]'" *Booker,* 543 U.S. at 264 (*quoting* 28 U.S.C.

§ 991(b)(1)(B)).  The Fourth Circuit has provided the following guidance in the wake of *Booker*:

> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.  Then, the court shall consider that range as

> well as other relevant factors set forth in the guidelines and those factors set forth in
> [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).   Thus, sentencing courts must

consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect

the seriousness of the offense, to promote respect for law, and to provide just punishment for the

offense; [and] to afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(A) and

(B); *Biheiri*, 356 F.Supp.2d at 594.

Section 3553(a) requires a sentencing court to consider the nature and circumstances of the

offense and the history and characteristics of the defendant, as well as the need for the sentence

imposed to:  reflect the seriousness of the offense, promote respect for the law, provide just

punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from

further crimes of the defendant, and provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner.   Applying

these sentencing factors to the facts of this case demonstrates that a sentence of 135-168 months of

incarceration is appropriate and reasonable.

The eleven felony counts that defendant has been convicted of constitute serious offenses.

MARPOL seeks the "complete" elimination of pollution of the sea.   MARPOL Protocol, 1340

U.N.T.S. 61.   The intentional discharge of oil into the sea from ships is a major problem and the

amount of oil discharged each year has been estimated to be over eight times the amount of oil

spilled from the Exxon Valdez.   *See* Exhibit C at 4.   The Coast Guard is charged with inspecting

ships and enforcing MARPOL.   Because of the volume of commercial shipping coming to the

United States, the only way the inspection regime can work properly is if the Coast Guard is able to

rely on the accuracy of the records maintained by crewmembers on inspected vessels.   If records

are intentionally falsified, Coast Guard inspectors are not able to determine whether a vessel is properly disposing of its oily waste.   In this case, defendant engaged in a conspiracy to prevent the Coast Guard from learning what was truly happening with its bilge waste and to deceive the Coast Guard in order to conceal intentional overboard discharges of oil.   It is the defendant's intentional effort to prevent the Coast Guard from figuring out what was actually happening on the ship – the illegal discharge or machinery space bilge waste and hiding the magic pipe - that is the gravamen of these offenses.

Defendant is a trained and licensed engineer who had been at sea for a number of years. As a part of his licensing and credentialing he became perfectly aware of the requirements of MARPOL and that the United States Coast Guard would inspect the vessel to determine if it is in compliance.   Despite that knowledge, defendant chose to intentionally violate the law, thus demonstrating his complete lack of respect for the law.   A Guidelines sentence would in this case also promote respect for the law.

A Guidelines sentence would also provide a just punishment for the crimes and act as a deterrent not only to defendant committing future crimes of this nature, but also deterring other mariners from committing these crimes.   The maximum punishment for a violation of 18 U.S.C. § 1519 is 20 years of incarceration.   The base offense level for a violation is 14, which equates to 1.25 to 1.75 years of incarceration out of a potential of 20 years.   The guidelines recognize that there are varying levels of severity of obstruction and provides numerous specific offense characteristics to address levels of severity.   As noted in the background of Section 2J1.2 "This section addresses offenses involving the obstruction of justice generally prosecuted under [18 U.S.C. § 1519]…the specific offense characteristics reflect the more serious forms of obstruction." In this case, the Guideline offense level after taking into consideration defendant's role in the

14

offenses, the discharges, instructing witnesses to lie, subordination of perjury, threats to kill, probative record, and grouping two sets of offenses, is a total of 35. The Guideline sentence is 135-168 months of incarceration. This is a significant punishment and reflects the seriousness of the course of criminal conduct that defendant undertook.

A Guidelines sentence would also not pose an unwarranted sentencing disparity. There have been numerous cases in which engineers have pled pre-indictment to an APPS count and received sentences ranging from probation to 12 months and a day of incarceration. Most of those cases involve cooperation and acceptance of responsibility in the context of a plea agreement and did not involve subordination of perjury. In *United States v. Alejandro Gonzalez*, No. 1:11-CR-20868 (S.D. Fla.) the defendant was charged with and convicted by a jury of obstruction of justice, 18 U.S.C. § 1505, for falsely certifying to the Coast Guard that certain complete inspections and surveys of a vessel were carried out when in fact they were not. The Guidelines for 18 U.S.C. § 1505 and 18 U.S.C. § 1519 are the same base offense level of 14. USSG §2J1.2. In *Gonzalez*, the court added a 2 point enhancement for use of a special skill under Section 3B1.3, since the defendant was a marine surveyor. This brought Gonzalez's overall offense level to 16 with a Guidelines incarceration range of 21-27 months. The defendant did not testify at trial and did not suborn perjury. The Court sentenced the defendant to 21 months incarceration, on the low end of the Guidelines range.

This is obviously an extraordinarily serious offense and far surpasses the conduct in *Gonzalez*. The defendant order sludge and oily bilge waste to be discharged into the sea. He covered up those discharges by failing to record in the Oil Record Book those discharges. He ordered the magic pipes to be hidden on top of the engine control room knowing the Coast Guard did not inspect such an area. He ordered the engineering crew to lie to the Coast Guard if ever

15

asked about the magic pipes.   When the Coast Guard came on board he denied any knowledge about the magic pipes and even tried to take the Sounding Log from a Coast Guard inspector.   He threatened to kill the Third Engineer.   And then during the prosecution of his case he intentionally introduced sworn deposition testimony that he knew was false and then did nothing about the misleading testimony provided by his expert witness.   All of these factors warrant a Guideline sentence and differentiate the defendant from other convicted Chief Engineers.   Such a message is imperative in a community such as the Hampton Roads area that has such a large and important commercial maritime presence.

## X.   A Downward Departure is Unwarranted

The defendant urges this Court to depart downward because the Sentencing Guideline for 18 U.S.C. § 1519 "significantly overstates the seriousness of the offenses for which Prokakis was convicted in Counts 5-10 and is outside the heartland for this record-keeping offense…"   ECF Doc 124 at 2.   Relying upon the logic espoused in *Sanford*, defendant's further argue that the false entries were made in the oil record book when "there was no pending, imminent or even foreseeable Coast Guard investigation."   *Id*. at 5.   Despite defendant's contentions, his case is factually distinguishable from *Sanford* and a downward departure is unwarranted.

Unlike the defendant in *Sanford*, the defendant in the instant case was convicted of more than just a record keeping offense.   Unlike defendant Sanford, defendant Prokakis stands before the Court having been convicted of conspiracy and obstruction of justice, in addition to a "record-keeping offense."   The evidence at trial established that defendant was a manager and supervisor in a conspiracy, not only to falsify the oil record book, but to also illegally discharge oily water and to conceal the "magic pipe" from Coast Guard inspectors.   Such conduct distinguishes this case from *Sanford* as defendant Prokakis' conduct was more extensive and

16

serious than a mere "record-keeping offense."

Furthermore, the defendant's reliance on the *Sanford* decision is misplaced as it is factually distinguishable from the instant case.   In *Sanford* the defendant was not on board the vessel when the Coast Guard inspection occurred and therefore he did not present the oil record book to the Coast Guard.   If that had been the case, it is clear the *Sanford* court <u>would</u> have used Section 2J1.2 as the appropriate guideline in that case.   *See* ECF Doc 124-1 at 28, ("But when [the defendant] wasn't there to lie to the face of the Coast Guard agents, to present – actually present the book to obstruct that investigation, to tell crew members to lie, so he didn't engage in that next step of obstructive conduct that I think might have *easily* qualified him for application of 2J1.2") (emphasis added).   In the instant case, defendant was onboard the vessel during the inspection, lied to the Coast Guard, presented a false oil record book, and instructed the crewmembers to lie to the inspectors.   Therefore, because even the authority the defendant relies upon agrees, the defendant should receive the higher base offense level under Section 2J1.2 of the sentencing guidelines.

Finally, the government respectfully disagrees with the court's ruling in the *Sanford* decision insofar as it pertains to the idea that a Coast Guard inspection is not foreseeable. Defendants such as Boumpoutelos and Prokakis with their decades of maritime experience know that they are subject to a possible Coast Guard inspection of their vessel and records every time they enter a port of the United States.   They also know that their oil record book is the primary record that will be examined to ensure compliance with MARPOL.   Such knowledge on the part of defendant places this offense squarely in the heartland of conduct that is to be deterred by 18 U.S.C. § 1519 and by extension, Section 2J1.2 of the Sentencing Guidelines as it is conduct designed to frustrate a future investigation.   Indeed, the *Sanford* court's logic ignores the fact that

17

the only rationale behind falsifying an oil record book is to obstruct a potential investigation. Certainly, a false oil record book does not confer a commercial advantage to the corporation. Nor does it provide a benefit to the safe navigation or operation of the vessel. Falsifying an oil record book can serve only one true purpose: to obstruct an investigation concerning the vessel's compliance with MARPOL.

As such, Section 2J1.2 is the appropriate guideline and the defendant should not be awarded a downward departure.

## XI.    Conclusion

Therefore, for the foregoing reasons, and other reasons to be more fully articulated at the sentencing hearing, the United States submits that a sentence of 135-168 months of incarceration is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

DANA J. BOENTE
ACTING UNITED STATES ATTORNEY

By:    _____/s/_____
Joseph L. Kosky
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number (757) 441-6331
Facsimile Number (757) 441-3205
E-Mail Address - joseph.kosky@usdoj.gov

ROBERT G. DREHER
ACTING ASSISTANT ATTORNEY GENERAL
Environment and Natural Resources Division
United States Department of Justice

By:      _____/s/_____
         Kenneth E. Nelson
         Trial Attorney
         Environmental Crimes Section
         United States Department of Justice
         601 D. Street, NW, Suite 2814
         Washington, DC 20004
         Office Number (202) 305-0435
         Facsimile Number (202) 514-8865
         E-Mail Address – kenneth.nelson@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of November, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Michael G. Chalos, Esquire
Chalos O'Connor, LLP
366 Main Street
Port Washington, New York 11050
mchalos@codus-law.com

Trey R. Kelleter, Esquire
Vandeventer Black, LLP
500 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
tkelleter@vanblk.com

Carl Woodward, Esquire
Carella, Byrne, Cecchi, Olsen, Brody, & Agnello, P.A.
5 Becker Farm Road
Roseland, New Jersey 07068
cwoodward@carellabyrne.com

Lawrence Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
4525 South Boulevard, Suite 300
Virginia Beach, Virginia 23452
lwoodward@srgslaw.com

Michael K. Twersky, Esquire
Fox Rothschild, LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
mtwersky@foxrothschild.com

Patrick H. O'Donnell, Esquire
Kaufman & Canoles
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
phodonnell@kaufcan.com

_____/s/_____
Joseph L. Kosky
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number (757) 441-6331
Facsimile Number (757) 441-3205
E-Mail Address - joseph.kosky@usdoj.gov